[Cite as *State v. Sparks*, 2011-Ohio-3868.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee                 :          C.A. CASE NO. 2010 CA 55

v.                                     :          T.C. NO.    1001340
                                             1006003

DAVID SPARKS                           :
                                     (Criminal appeal from
    Defendant-Appellant               :          Fairborn Municipal Court)

                                    :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   5th   day of    August   , 2011.

. . . . . . . . . .

BETSY A. DEEDS, Atty. Reg. No. 0076747, Assistant Fairborn Prosecutor, 510 West Main Street, Fairborn, Ohio 45324
        Attorney for Plaintiff-Appellee

NICHOLAS W. MYLES, Atty. Reg. No. 0083973, 2000 Courthouse Plaza, N.E., P. O. Box 8801, Dayton, Ohio 45401
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of David C. Sparks, filed July 30, 2010. On July 1, 2010, Sparks received a citation for operating a motor vehicle while under the influence of alcohol ("OVI"), and OVI with a prior OVI conviction

within 20 years. He was also cited for failure to reinstate his driver's license and for disorderly conduct. Sparks pled not guilty. At trial to a jury, on July 21, 2010, in Fairborn Municipal Court, Sparks stipulated to the jury that he had a prior conviction for OVI on December 12, 2005. In the course of the trial, the disorderly conduct charge was amended to a minor misdemeanor from a misdemeanor of the fourth degree at the State's request. Following trial, the jury found Sparks guilty of OVI, with a prior OVI conviction within 20 years, in violation of R.C. 4511.19(A)(2), and failure to reinstate his license, in violation of R.C. 4510.21, both misdemeanors of the first degree. Sparks was sentenced to 180 days in jail for each offense to be served concurrently, and his license was suspended for five years. The trial court found Sparks guilty of the minor misdemeanor disorderly conduct charge.

{¶ 2} At trial, Nicole Vawter, James Heider and Deputy Shawn M. Bradley of the Greene County Sheriff's Office testified. Vawter testified that on the date of the incident, she and a friend left work at Patriot Ridge Community, a nursing home in Fairborn, to pick up lunch at Arby's. On their return, at about 11:30 a.m., while traveling on Byron Road, in Bath Township, Vawter noticed a white car that was stopped "halfway on the road." As Vawter passed the white car, she observed Sparks in the driver's seat with his eyes closed and his head down. He was the only occupant of the vehicle. Vawter stopped her vehicle in front of the white car and dialed 911.

{¶ 3} Vawter then approached the white car and observed that the windows were down. Vawter spoke loudly to Sparks, who initially did not respond. According to Vawter, another "car came up behind us and there was another woman in the car so she got out and we were all saying are you okay. And then he just woke up. And so after he woke

up, he was mumbling and slurring his words about something - - someone was coming to get him, his girlfriend was on her way. So we continued to just talk to him. Well, just stay here, and you know, wait for her. And then he got out of the car and was fumbling around looking for his phone and then when I told him his phone was in his hand, he got back in the car." Sparks sat in the car for "a couple minutes" and then stated that he needed to get to work. Vawter told him to "stay here, wait if someone is coming to get you. But then he started the car up. So at that time I got back in the car and he pulled out so I pulled away because I didn't want him to hit us. And as he was pulling away, he went all the way over to the left side of the road and then all the way back over to the right. And then as we were going up the hill, we flagged down a truck that was coming the other way to warn him that someone was behind us because at that time we couldn't see him any longer." Vawter testified that as Sparks started the vehicle, he picked up a can and drank from it. Vawter stated that she was able to observe Sparks swerving through her rear view mirror as she drove up the hill.

{¶ 4} Heider testified that he is a road maintenance employee for Bath Township, and he was mowing grass along Byron Road, traveling north, when he noticed "three vehicles on the roadway, approximately a hundred and fifty yards ahead of me. They were all stopped" in the northbound lane. The vehicle in the middle was white. Heider observed "the individual with that [white] car throw some trash out there in that area." Believing there may have been an accident, Heider approached the vehicles. According to Heider, as he neared the vehicles, a woman approached him, and based upon the information that she gave him, Heider dialed 911. While making the call, the white vehicle began

driving north on Byron Road, and Heider stated that the vehicle was "weaving." Heider testified that the two remaining vehicles proceeded up the road as well, and that the white vehicle came to a stop "about three hundred yards" up the road, left of center, at the bottom of a hill. Heider went past the white car and up to the top of the hill and "blocked the road" for safety purposes. Heider "stayed there at the top of the hill in the tractor and got out periodically. There were two vehicles that were southbound. I did let those two through after I talked to them and I told them that they better be careful."

{¶ 5} According to Heider, "the individual who had been operating the white car had gotten out of it, walked up that hill, passed me and then continued northbound." Before doing so, Heider observed Sparks move his vehicle to the side of the road. Heider stated that Sparks exited from the driver's side, and he did not observe any other person exit the white vehicle. Heider stated that Sparks was "staggering," and that Heider again called 911 out of concern for Sparks' safety. Heider observed Sparks "take a couple of drinks" from a can as he walked up the hill. Heider identified Sparks as the person he observed get out of the white vehicle and walk past him.

{¶ 6} Heider stated that Deputy Bradley, followed by Deputy Hill, arrived at the scene. Hill showed Heider a can that he retrieved from the area where the white car originally was stopped. Heider, however, could not identify the can.

{¶ 7} Deputy Bradley testified that he has been employed at the Greene County Sheriff's office for 15 years, and that he is assigned to the patrol division. He described the procedures he employs, having been trained, to administer three field sobriety tests, namely the horizontal gaze nystagmus test ("HGN test"), the one legged stand test, and the walk and

turn test. Bradley further described how he evaluates the individual to whom the tests are administered. In the course of administering the tests, Bradley testified that he also considers the appearance and demeanor of the subject. Bradley stated that he was dispatched to Byron Road at 11:51 a.m. on the date of the incident, and that upon arrival he initially observed an unoccupied white Chevy Cavalier on the side of the road. Bradley noted that the car was warm to the touch, which indicated to him that it had recently been driven. Bradley testified that he began to search the area for "somebody in the vicinity, maybe walking or maybe having a medical problem." Bradley verified that the car was not stolen and then proceeded northbound on Byron Road in his cruiser. According to Bradley, as he "was driving up, there was a blue truck that passed and kind of slowed down for me. I put my window down and (unintelligible) I think the guy you're looking for is up the road that way, referring to northbound." After cresting a hill, Bradley observed Sparks "kind of staggering" on the left side of the road, and he also observed a lawn mower.

{¶ 8} Bradley stopped his vehicle and motioned for Sparks to approach him. As he did so, Bradley observed another vehicle passing by, and he noted, "I was behind the tractor, looking around in the northbound lane. I observed the individual in question stagger out into the road. He had been walking kind of off the road and on the road, back off, staggering, and then he staggered out in front of the blue vehicle, which was I believe a mini van." The minivan came to a stop, Sparks got out of the way, and the minivan continued traveling down the road.

{¶ 9} Sparks nexrt approached Bradley, and Bradley testified, "I noticed that he had a pronounced strong odor of alcoholic beverage about him." Bradley stated, "When I

initially asked him if he had been with the white vehicle, he said no. I asked him if that was his and he said no. And when we found out who it came back to, he overheard the name and he said, oh, that's my girlfriend. * * * he said he wasn't driving it. One of the things he indicated was that the car was out of gas and that his girlfriend had left with one of his buddies and that he called the buddy to come get her."

{¶ 10} Bradley administered the three field sobriety tests, all of which Sparks failed. Regarding the HGN test, Bradley testified that there was a lack of smooth pursuit in each eye, and there was "an onset of nystagmus prior to 45 degree angle in both eyes" and there was nystagmus "at maximum deviation with both eyes." Sparks exhibited six out of six indicators of impairment. Regarding the one legged stand test, Bradley testified that Sparks began the test before Bradley advised him to do so, and he put his foot down three times and raised his arms for balance before stating that he was having problems performing the test because of allegedly uneven terrain. Bradley stated that he was able to demonstrate the test to Sparks without difficulty in the same area. Regarding the walk and turn test, Bradley stated that Sparks "wouldn't even let me explain it to him or let me demonstrate it. He just started. And I was trying to get him to stop and, you know, just do this. And he indicated I know what I'm doing and he went ahead and took the first nine steps. If I remember correctly, from the third to the seventh step on the first series of nine steps, he did not touch his heel to toe. He did have his arms off to the side using them for balance. He performed the turn incorrectly. And on the second set of nine steps he took too many steps, did not touch heel to toe on any of them. He seemed to be getting increasingly agitated about having to do it." Based upon his experience, Bradley concluded that Sparks "was legally

impaired," and he placed him in handcuffs and advised him that he was under arrest for OVI. Bradley described patting Sparks down for weapons, and in the course of the pat down he retrieved a set of car keys from Sparks' "right front pocket."

{¶ 11} Bradley testified that his cruiser was 10 - 15 feet from Sparks, and that the cruiser has a camera that recorded the field sobriety tests administered to Sparks. Bradley identified the DVD from the camera, and it was played for the jury. Bradley identified Sergeant Bates and Deputy Hill on the DVD and stated that they responded to assist him. Bradley did not speak to either Vawter or Heider in the course of his investigation. Bradley testified that he told Sparks, "* * * I got two people who saw you driving."

{¶ 12} Bradley stated that he transported Sparks to the Fairborn City Jail for a breath test. The following exchange occurred regarding the breath test:

{¶ 13} "Q. Okay. So did you explain to him the breath test; is that right?

{¶ 14} "A. I told him I was going to ask him to take a breathalyzer test. The best that I could.

{¶ 15} "Q. Did you explain to him the consequences of a refusal to submit to the breath test?

{¶ 16} "A. I started to.

{¶ 17} "Q. When you testified you started to, why didn't you finish?

{¶ 18} "A. For lack of a better way of putting it, he became quite belligerent.

{¶ 19} "Q. Okay.

{¶ 20} "A. And while I was trying to (unintelligible) are you going to let me read this to you and because it's on the back of a form, that is a (unintelligible), the response, I

said, are you going to let me read this, fuck you.

{¶ 21} "Q.   Okay.   Did he - - did he submit to the test?

{¶ 22} "A.   No, he didn't.

{¶ 23} "Q.   Did you offer the test to him again at some point?

{¶ 24} "A.   We tried but again he just kept yelling (unintelligible) he's not being cooperative.   He just said something like this can't work, he's not going to do it. (Unintelligible) him back up, put him back in the (unintelligible) transport him to the jail."

{¶ 25} Bradley then transported Sparks to the Greene County Jail.   Bradley stated that he wrote traffic citations for OVI, OVI with a prior OVI conviction, failure to reinstate and a misdemeanor citation for disorderly conduct.   He requested a certified copy of Spark's driving record from the Bureau of Motor Vehicles.

{¶ 26} On cross-examination, Bradley stated that he did not check Sparks' cell phone to verify that he had recently made a call, consistent with his statement that he had called "a buddy" to pick up his girlfriend.   In evaluating Sparks' appearance, Bradley stated that Sparks had not vomited or urinated on himself.

{¶ 27} On redirect examination, Bradley stated that Sparks' eyes were "a little bit kind of glassy," and that Sparks' balance was "[n]ot very good at that time.   He was swaying when I was talking to him at times."   Bradley stated that Sparks' speech was slurred, "[n]ot a strong slur but it was present."   Bradley stated that he did not observe Sparks driving the vehicle.

{¶ 28} At the close of the State's evidence, Bradley moved for an acquittal pursuant to Crim.R. 29.

{¶ 29} Sparks asserts two assignments of error. His first assignment of error is as follows:

{¶ 30} "THE TRIAL COURT ERRED BY DENYING MR. SPARKS' CRIM.R. 29 MOTION FOR ACQUITTAL."

{¶ 31} "A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence presented at trial. (Citation omitted). Under Crim.R. 29, a trial court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. (Citation omitted). Furthermore, a trial court must view the evidence in a light most favorable to the State when considering a motion for acquittal. (Citation omitted).

{¶ 32} "An appellate court undertakes de novo review of the trial court's decision on a Crim.R. 29(A) motion and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt." (Citation omitted). *State v. Turner*, Montgomery App. No. 18866, 2002-Ohio-54.

{¶ 33} Sparks' first assigned error is addressed solely to his conviction pursuant to R.C. 4511.19(A)(2), and he argues, the "State presented *no* evidence that he was informed of the consequences of his refusal to consent to a chemical test, and minimal evidence that he operated a motor vehicle under the influence of alcohol."

{¶ 34} R.C. 4511.19(A)(2) provides: "No person who, within twenty years of the conduct described in division (A)(2)(a) of this section, previously has been convicted of or

pleaded guilty to a violation of this division, a violation of division (A)(1) or (B) of this section, or any other equivalent offense shall do both of the following:

{¶ 35} "(a) Operate any vehicle, * * * within this state while under the influence of alcohol, a drug of abuse or a combination of them;

{¶ 36} "(b) Subsequent to being arrested for operating the vehicle, * * * as described in division (A)(2)(a) of this section, being asked by a law enforcement officer to submit to a chemical test or tests under section 4511.191 of the Revised Code, and being advised by the officer in accordance with section 4511.192 of the Revised Code of the consequences of the person's refusal or submission to the test or tests, refuse to submit to the test or tests."

{¶ 37} Sparks directs our attention to R.C. 4511.192(A), which provides: "Except as provided in division (A)(5) of section 4511.191 of the Revised Code, the arresting law enforcement officer shall give advice in accordance with this section to any person under arrest for a violation of division (A) or (B) of section 4511.19 of the Revised Code * * * . The officer shall give that advice in a written form that contains the information described in division (B) of this section and shall read the advice to the person.  The form shall contain a statement that the form was shown to the person under arrest and read to the person by the arresting officer.  One or more persons shall witness the arresting officer's reading of the form, and the witness shall certify to this fact by signing the form."  R.C. 4511.192(B) provides a form that the arresting officer "shall read" to the person under arrest.  In addressing the constitutionality of R.C. 4511.19(A)(2) under the Fourth Amendment in *State v. Hoover*, 123 Ohio St. 3d 418, 2009-Ohio-4993, the Supreme Court of Ohio enumerated the elements of the statute necessary for a successful conviction: "There are three elements

of a charge pursuant to R.C. 4511.19(A)(2): (1) a DUI conviction within 20 years of the current violation, (2) operation of a motor vehicle while under the influence of alcohol or drugs, and (3) a refusal to submit to a chemical test while under arrest for the current DUI." Id. at 421.

{¶ 38} Regarding Sparks' assertion that he was not properly advised of the consequences

{¶ 39} of refusing the breath test, we note that no objection was made to evidence of Spark's refusal to submit to the test, and there was no motion in limine challenging Spark's refusal. The record reflects that Bradley was in possession of the form that R.C. 4511.192(A) requires, and that he attempted repeatedly to read it to a belligerent Sparks. Bradley's failure to read the entire form was caused by Sparks' belligerence and refusal to listen, and the record unequivocally supports a finding that Sparks voluntarily refused to submit to the test. Further, Sparks did not file a motion to exclude the evidence of his refusal on the basis of Bradley's purported failure to properly advise him of the consequences of a refusal, thus we cannot conclude that such a motion would have been successful. We note that the trial court instructed the jury, without objection, that "It need not be shown that the person understood the consequences of his refusal. A refusal to submit to a chemical test occurs when a person by his acts, words or general conduct manifests an unwillingness to submit to the test." (Tr. 193:24-194:4.) In other words, viewing the evidence in a light most favorable to the State, the record before us is sufficient to support the denial of Sparks' motion for acquittal.

{¶ 40} Regarding Sparks' assertion that "minimal evidence" was presented to show

that he operated a motor vehicle while under the influence of alcohol , we disagree.   Operate means to "cause or have caused movement of a vehicle * * *."   R.C. 4511.01(HHH). Vawter found Sparks alone and unresponsive in the driver's seat of the white car.   Once awake, Sparks first told her in slurred speech that his girlfriend was coming to get him.    He  then told Vawter that he needed to get to work, and he started his car and pulled away. Vawter observed Sparks swerving back and forth across the road.

{¶ 41} Heider observed the white vehicle "weaving."   He testified that the "individual who had been operating the white car had gotten out of it" and walked past him on the hill, and Heider identified Sparks as that individual.   Heider stated that Sparks exited from the driver's side of the car, and that he was staggering.   Construing the evidence in a light most favorable to the State, we conclude that the trial court properly overruled Sparks' motion for acquittal, and his first assigned error is overruled.

{¶ 42} Spark's second assigned error is as follows:

{¶ 43} "MR. SPARKS WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL AS A RESULT OF THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL."

{¶ 44} According to Sparks, "First, counsel did not move to suppress Deputy Bradley's testimony, even though Deputy Bradley did not have probable cause to administer a field sobriety test, or to arrest Mr. Sparks.   Second, trial counsel's erroneous application of the law - *i.e.*, the belief that evidence of prior convictions could not be presented to the jury - led to a stipulation to an essential element of the state's case."

{¶ 45} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104

S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * * . Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, Montgomery App. No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 46} "1. Under certain circumstances, a warrantless arrest for operating a motor vehicle while under the influence of alcohol may be made even though the officer has not viewed the commission of the offense.

{¶ 47} "2. Guidelines have been established for a decision on the validity of a warrantless arrest for operating a motor vehicle while under the influence of alcohol if the operation of the vehicle is not actually viewed by the arresting officer.

{¶ 48} "First, chronology is an important element in 'drunken driving' cases. A relationship must be established between the time there was evidence to show the influence of intoxicants and the time of operating the vehicle.

{¶ 49} "Second, generally each 'drunk driving' case is to be decided on its own particular and peculiar facts.

{¶ 50} "Third, although the charge of operating a motor vehicle under the influence of intoxicating liquor may apply where a stationary vehicle is involved, the evidence must show beyond a reasonable doubt that the accused was under the influence of intoxicating liquor while operating the vehicle in that condition." (Citation omitted). *City of Xenia v. Manker* (1984), 18 Ohio App.3d 9, syllabus.

{¶ 51} In *State v. Spillers* (March 24, 2000), Darke App. No. 1504, we noted, "[i]n determining whether police intrusion upon a citizen's protected liberty interests is reasonable, both the extent of the intrusion and the basis for suspicion must be considered. In other words, the greater the intrusion, the greater the basis for suspicion must be. (Citations omitted).

{¶ 52} "Thus, an analysis of an investigatory stop leading to an arrest requires careful attention to each stage of the detention in order to make sure that the extent of the intrusion represented by each stage is warranted by the officer's reasonable and articulable suspicion at that point."

{¶ 53} Spillers was stopped after "de minimis" lane violations, he admitted to having "a couple" of beers, and the arresting officer noted a "slight" odor of alcohol. We determined that "traffic violations of a de minimis nature are not sufficient, combined with a slight odor of an alcoholic beverage, and an admission to having consumed 'a couple' of beers to support a reasonable and articulable suspicion" of OVI. See also *State v. Dixon* (Dec. 1, 2000), Greene App. No. 2000-CA-30 (holding that arresting officer properly stopped Dixon because his vehicle appeared to have overly tinted windows, but that subsequent observations, namely that it was 2:20 a.m., that Dixon had glassy, bloodshot eyes

and an odor of alcohol about his person, did not justify the administration of field sobriety tests.)

{¶ 54} Having thoroughly reviewed the record, in contrast to the arresting officers in *Spillers*, and *Dixon*, we conclude that Bradley had a reasonable and articulable suspicion of an OVI violation such that the administration of the field sobriety tests was justified. Vawter testified that she encountered an unresponsive Sparks, who after being awakened, slurred his speech and fumbled for his phone before starting his car and pulling away, at about 11:30 a.m. Bradley testified that he was dispatched to the scene at 11:51a.m. When Bradley arrived, the white vehicle was warm to the touch, indicating that it had recently been driven. Sparks was observed "staggering" in the roadway, he had a pronounced smell of alcohol about his person, he had glassy eyes (at close to the midpoint of the day and not at 2:20 a.m.) and, upon being addressed by Bradley, was "swaying" on his feet. In other words, a relationship between the time there was evidence to show the influence of alcohol and the time of operating the white vehicle is demonstrated. Since the evidence on these particular facts shows that Bradley had a reasonable and articulable suspicion to administer the field sobriety tests, we cannot conclude that defense counsel's failure to file a motion to suppress Bradley's testimony regarding his administration of the tests fell below an objective standard of reasonableness, or that the outcome of the trial would have been different had Sparks moved to suppress Bradley's testimony.

{¶ 55} As to Sparks' assertion regarding defense counsel's allegedly erroneous "belief that evidence of prior convictions could not be presented to the jury," the record reflects the following exchange outside of the presence of the jury:

{¶ 56} "MS. MILLER: Just have a motion in limine to exclude any convictions for prior OVIs. The prior OVI law (unintelligible) half the penalty under 4511.19(A)(2) because there were prior convictions and refusal.

{¶ 57} "But it's not an element of the underlying OVI and I think it's going to confuse the jury more or to prejudice my client. I mean, if they find him guilty on the underlying OVI, I understand a prior conviction can be used to enhance the penalty but the prior conviction is not an element of the offense. So I don't think it should come in. I have a copy if you want it.

{¶ 58} "THE COURT: That's fine. I'm well aware of the case law. * * *

{¶ 59} "MR. PEIFER: Your Honor, I disagree with this. There are two offenses here - - well, there are more than two offenses but the two offenses at issue are the OVI (A)1(a) * * * and (A)2, with the other prior convictions.

{¶ 60} "I do agree with Miss Miller that the - - there is no element of prior convictions with respect to OVI (A)1(a), but it is an element of OVI (A)2. And so my position is that * * * there is relevancy to this. It is an element of the offense and I think it should be presented in the merits phase of this.

{¶ 61} "THE COURT: Actually, case law is quite well settled on this and Mr. Peifer's analysis is correct. Under the (A)1(a) section that fact that it's a second within six years, the second does not come in, that is simply a sentencing issue, but under the (A)2 section with a prior within 20, that is a specific element of that offense and he actually has to prove that element beyond a reasonable doubt to have that conviction. So - -

{¶ 62} " * * *

**{¶ 63}** "- - - the motion is overruled.

**{¶ 64}** " * * *

**{¶ 65}** "MR. PEIFER: It's my understanding there will be a stipulation to three prior convictions.   There are more than three prior convictions, Your Honor, but * * * all three are not within 20 years, three are within 20 years.

**{¶ 66}** "MS. MILLER: I'll stipulate to one.   You only need one for that element.

**{¶ 67}** " * * *

**{¶ 68}** "THE COURT:   She's stipulating to a prior OVI within 20 years, a conviction of that.   There is really not any further issue then for the jury, so I do think that would be prejudicial to add on if she's actually making that stipulation.

**{¶ 69}** "* * *

**{¶ 70}** "THE COURT: * * * What is the actual stipulation that you are presenting?

**{¶ 71}** "MS. MILLER: That he had a prior conviction for OVI.

**{¶ 72}** "THE COURT: There would have to be a date and place and all that.

**{¶ 73}** "* * *

**{¶ 74}** "MR. PEIFER: I don't have my certified copies at this point.

**{¶ 75}** "THE COURT: I can tell you there is one here.

**{¶ 76}** "MS. MILLER: July 28, 2005.

**{¶ 77}** " * * *

**{¶ 78}** "THE COURT: The conviction date is the important part.   December 12[th] of '05 was the conviction date.

**{¶ 79}** "* * *

**{¶ 80}** "THE COURT: * * * my ruling is that she's making the stipulation. I would not allow any other convictions to come in because the stipulation is there for that element.

**{¶ 81}** "MR. PEIFER: Okay.

**{¶ 82}** "THE COURT: So I do believe it would be prejudicial to add any other information seeing as that stipulation is made."

**{¶ 83}** It is undisputed that Sparks had multiple prior convictions within 20 years. A prior conviction within 20 years is an element of R.C. 4511.19(A)(2). By stipulating to a prior conviction, the prosecutor was relieved of his obligation to prove a prior, but this was not the focus of the defense and was not controverted. The stipulation may well have been a matter of trial strategy. We cannot conclude that defense counsel's stipulation to one of Spark's previous convictions fell below an objective standard of reasonableness, or that the outcome of the trial would have been otherwise had defense counsel not so stipulated. There is no showing on this record that the prosecutor was unable to establish a prior conviction absent the stipulation.

**{¶ 84}** There being no merit to Sparks' second assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Betsy A. Deeds
Nicholas W. Myles
Hon. Beth W. Root