[Cite as *State v. Stewart*, 2024-Ohio-2735.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-47 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 0240 |
| | : | |
| BRAD A. STEWART | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on July 19, 2024

. . . . . . . . . . .

KRISTIN A. ARNOLD, Attorney for Appellant

MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Brad A. Stewart appeals from his convictions, following a jury trial, of aggravated murder and numerous other offenses. Some of the counts included firearm specifications, and there was a forfeiture specification with respect to a firearm. Stewart was also convicted in a bench trial of having weapons while under disability. He appeals,

challenging only the sufficiency of the evidence in support of his aggravated murder conviction. For the reasons that follow, the judgment of the trial court is affirmed.

**Facts and Procedural History**

{¶ 2} Stewart shot the victim, Jacob Scoby, in the early morning of May 26, 2022, at the Roundtable Bar in Xenia. Some of the interactions preceding the shooting and the shooting itself were witnessed by others and were captured on surveillance videos. At trial, Stewart did not deny that he shot Scoby, but he asserted that the shooting happened accidentally and/or that it was not done with prior calculation and design.

{¶ 3} On June 3, 2022, Stewart was indicted on numerous offenses, including aggravated murder. Before trial, Stewart filed a motion in limine, which sought to prohibit the State from introducing evidence of a Snapchat post he allegedly made prior to the murder. According to the motion, during law enforcement's investigation into the shooting, someone told a detective that he had seen a Snapchat story of Stewart's the weekend before the shooting in which Stewart allegedly "tagged" Scoby and threatened to kill him the next time he saw him. The State opposed Stewart's liminal motion, and the court overruled it after a hearing.

{¶ 4} Stewart was tried in June 2023. At the conclusion of the State's case, Stewart moved for a judgment of acquittal, and the court overruled his motion. After Stewart testified in his defense, he renewed his Crim.R. 29 motion, and the court again denied the motion. Stewart was then found guilty of numerous offenses, some of which were merged at sentencing. The trial court sentenced Stewart to a mandatory prison term of life without the possibility of parole for aggravated murder, plus three years on the

accompanying firearm specification. With sentences for the other offenses and specifications, some of which were imposed consecutively, the aggregate sentence was an indefinite term of life without the possibility of parole plus 25 to 30.5 years.

## Assignments of Error and Analysis

{¶ 5} Stewart asserts two assignments of error, which we will consider together:

THE JURY'S VERDICT FINDING DEFENDANT-APPELLANT GUILTY OF AGGRAVATED-MURDER PURSUANT TO R.C. 2903.01(A) IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT-APPELLANT'S RULE 29 MOTION RELATING TO DEFENDANT-APPELLANT'S AGGRAVATED MURDER CHARGE.

{¶ 6} Stewart's assignments of error relate only to his aggravated murder conviction and argue that there was insufficient evidence to support that conviction. Specifically, Stewart argues that there was no evidence that the crime was premeditated or planned. First, Stewart asserts that none of the State's witnesses had knowledge of any disagreement between him and Scoby or of why Stewart would have wanted to kill Scoby. He asserts that surveillance video from the night of the shooting showed Stewart and Scoby enjoying each other's company at the Roundtable Bar prior to the shooting. According to Stewart, the State relied heavily on testimony about an alleged Snapchat post in an attempt to prove the element of prior calculation and design, but the post "failed to deduce any substantial evidence of a strained relationship" between Stewart and

Scoby and did not indicate that Stewart had a "prior scheme of implementing a plan to murder Scoby." Stewart argues that the "mere allegation" that he may have posted a vague Snapchat message indicating he may have been upset with the victim was insufficient to prove a strained relationship between them or that Stewart had developed a purposeful and calculated scheme to murder Scoby.

{¶ 7} Second, according to Stewart, the State did not establish that he "gave any advance thought to his weapon of choice" or had prior scheme to murder Scoby. He argues that the idea that he left the bar to obtain a gun for the purpose of killing Scoby was "a false narrative" and unsupported by any evidence. Stewart contends that the State did not produce any evidence "demonstrating Stewart's advance reasoning" or a plan to kill Scoby at a "selected murder site."

{¶ 8} Third, Stewart argues that the surveillance video established that the shooting was "an almost instantaneous eruption of events," lasting only 38 seconds from the time Stewart approached Scoby with the gun until the time Scoby was shot. Stewart argues that he acted on a momentary impulse, and that a reasonable juror could have only concluded that the incident "developed in the spur of a moment."

Jury Trial

{¶ 9} The State presented the testimony of several witnesses at trial. Lisa P. testified that she was bartending at the Roundtable Bar on the evening of May 25, 2022, into the early morning hours. She was acquainted with Scoby, Stewart, and Jacob W. as patrons of the bar, and she identified each of them in surveillance video from the bar that was played for the jury. Lisa had interacted with Scoby that night, and he was in no

way belligerent or aggressive. Lisa testified about what was depicted on the video. Stewart entered the bar at 12:08 a.m., left with Jacob W. at 12:19 a.m., and returned with him at 12:33 a.m. Upon his return, Stewart was wearing a cross-body bag that he had not had on his person before he left with Jacob W. Lisa did not witness any aggression or hostility exhibited by Scoby to Stewart. She testified that the video depicted Stewart hugging Scoby at 1:08 a.m. Scoby hugged Stewart again at 1:23 a.m. At 1:26 a.m., Lisa was shown in the video yelling at Stewart and others outside the bar after she saw Scoby on the ground in the parking lot. Lisa called 911. Lisa acknowledged that Scoby and Stewart were laughing and "playing around" in the video without any suggestion of hostility between them.

{¶ 10} Jacob W. testified that he had been "friendly" with Scoby from seeing him around town at bars and restaurants over the previous two years. Jacob was also acquainted with Stewart. On the date of the shooting, Jacob arrived at the Roundtable Bar alone, before Stewart arrived. He and Stewart then left the bar together in Jacob's truck to get cocaine, with Stewart driving the truck. Jacob W. testified that he had not observed Scoby threaten Stewart in any way or exhibit any hostility toward him; their interaction was friendly. Jacob stated that, when he and Stewart returned from getting drugs, Stewart had a satchel on his person that he had not had before. Shortly before the shooting, Stewart told Jacob that he was going to "beat [Scoby's] ass or fight him." Jacob did not know why Stewart wanted to harm Scoby.

{¶ 11} The following exchange occurred while the surveillance video was played for the jury during Jacob W.'s testimony:

[THE PROSECUTOR]: I'm going to pause it right here at 01:25:38, had you come outside at this point?

[JACOB W.]: Yes, I did.

[THE PROSECUTOR]: Do you see Mr. Scoby?

[JACOB W.]: Yes.

[THE PROSECUTOR]: Do you see Mr. Stewart?

[JACOB W.]: Yes.

[THE PROSECUTOR]: When you watched the video, does Mr. Stewart grab Mr. Scoby?

[JACOB W.]: Yes.

[THE PROSECUTOR]: Was Mr. Scoby's back to him?

[JACOB W.]: Yes.

[THE PROSECUTOR]: I'm going to pause it here just a moment at 01:25:42, do you see Mr. Stewart's left-hand?

[JACOB W.]: Yes.

[THE PROSECUTOR]: Did he have something in his left-hand?

[JACOB W]: Yes.

[THE PROSECUTOR]: What did he have?

[JACOB W.]: A gun.

* * *

[THE PROSECUTOR]: Do you see Mr. Stewart's hand that had the gun in it?

[JACOB W.]:   Yes.

[THE PROSECUTOR]:   What does he appear to be doing with it in the video?

[JACOB W.]:   Firing it.

[THE PROSECUTOR]:   Did you hear him doing anything with the gun while you were standing there?

[JACOB W.]:   Yes.

[THE PROSECUTOR]: What did you hear?

[JACOB W,]:   It dry-fired and made a clicking noise.

[THE PROSECUTOR]:   So, you heard him click the gun as it was aimed at [Scoby]?

[JACOB W.]:   Yeah.

* * *

[THE PROSECUTOR]:   I'm going to pause it right there at 01:26:04, do you see that?

[JACOB W.]:   Yes.

[THE PROSECUTOR]: Do you see Mr. Scoby's hands?

[JACOB W.]:   Yes.

[THE PROSECUTOR]:   What are his hands doing?

[JACOB W.]: Like, what's going on?

[THE PROSECUTOR]:   Expressing confusion?

[JACOB W.]:   Yes.

[THE PROSECUTOR]: I'm going to stop it at 01:26:09, do you see that?

[JACOB W.]: Yes.

[THE PROSECUTOR]: Do you see Mr. Stewart?

[JACOB W.]: Yes.

[THE PROSECUTOR]: Do you see his hands doing something?

[JACOB W.]: Yes.

[THE PROSECUTOR]: What is he doing with his hands?

[JACOB W.]: Racking the gun.

* * *

[THE PROSECUTOR]: Putting a round in the chamber?

[JACOB W.]: Yes.

{¶ 12} Jacob W. stated that the gun flashed when it was fired. Stewart then asked Jacob for the keys to his truck. Jacob did not want to give the keys to Stewart, but Stewart took them from his hand and drove away in the truck. Jacob later learned from Stewart via Snapchat that Stewart had left the truck at a dead end on Hook Road.

{¶ 13} Jacob W. identified a photo of the screen of his phone displaying the name "Stew-thejew," which he knew to be the name of Stewart's account on Snapchat. Jacob testified that, at some point prior to the shooting, he had observed a message from Stewart on Snapchat. He did not remember exactly what the message had said, but it was "threatening" and said something like I'm going to find you or shoot you," or something along those lines.

{¶ 14} On cross-examination, Jacob W. acknowledged that in an interview with a

detective, he had indicated that he did not believe Stewart intended to shoot Scoby; rather it appeared that Stewart was trying to pistol-whip Scoby. Jacob testified that it appeared that the gun went off while Stewart swung the gun from his right side across his chest to his left side. Jacob acknowledged that he had previously described Stewart's conduct as a scare tactic to intimidate Scoby, and he testified that Stewart had seemed shocked and "freaked out" after the shooting. According to Jacob, Stewart told Jacob that he wanted to fight Scoby as they walked out of the bar right before the shooting occurred. Jacob testified that Stewart had not threatened him with his gun to get the keys to Jacob's truck.

{¶ 15} Andrea R. testified that she had known Stewart for 15 years and knew his Snapchat account name to be "Stew-thejew." Three to five days before the shooting, Andrea observed a Snapchat message from the "Stew-thejew" account that was "a stream of four-to-five pictures, a blank background, with just words typed out on the screen," stating that when he found a certain person, he would "violently hurt them." Andrea could not recall the if the post included the name of the person.

{¶ 16} Crystal K. testified that she had been acquainted with Scoby and they had shared the same circle of friends. She had also been friends with Stewart on Snapchat and knew the "Stew-thejew" account to be his. Crystal testified that, after she learned that Scoby had been shot by Stewart, she remembered Stewart's prior post on Snapchat "that he was going to shoot someone in the face." Crystal did not remember the exact verbiage, word-for-word, that was used, but she remembered the phrase "shoot the m**********r in the face." Crystal testified that she had been discussing what had

happened with her brother when someone sent her a screenshot of that Snapchat post, which she did not save, but she passed it along to her brother. She described this as "a what-the-hell moment."

{¶ 17} Dr. Lee Lehman, a forensic pathologist at the Montgomery County Coroner's Office, testified regarding the autopsy he performed on Scoby. He testified that Scoby had been shot in the left side of his face, and the bullet had been recovered at the end of the wound at the base of Scoby's neck. According to Lehman, the bullet entered the lower-left-side of the face; went through the neck, larynx, and spine, severed Scoby's spinal cord, and ended up in his back.

{¶ 18} Stewart testified in his own defense. He stated that he had known Scoby for ten years; they had been friends, had had several friends in common, and often went to the same bars in Greene County. According to Stewart, he had had his gun with him at the bar when he initially arrived, before leaving to get the cocaine, and he had kept it in his pocket. He acknowledged that he was not permitted to carry a weapon, having been convicted of a felony when he was 18 years old. Stewart testified that when he met Scoby the night of the shooting, Stewart bore no animosity toward him and was happy to see him, and that the overall mood in the bar was relaxed.

{¶ 19} Stewart identified himself and Scoby in the surveillance video laughing together before he left with Jacob W. to get cocaine. Stewart testified that his gun had been in his pocket at that time, and that when he and Jacob returned to the bar, the gun was either still in his pocket or in his bag. Stewart stated that the cocaine he had obtained, some marijuana, and some scales were in the bag. He denied leaving the bar

to get his gun after seeing Scoby there, and he testified that he was not carrying the gun for any reason associated with Scoby. Stewart also denied making a threatening post on Snapchat.

{¶ 20} While the surveillance video was played, Stewart testified as follows regarding the shooting:

[DEFENSE COUNSEL]: I want to watch your interaction here. Did you just pull something out of that bag?

MR. STEWART: Yeah.

[DEFENSE COUNSEL]: What did you pull out?

MR. STEWART: A pistol.

[DEFENSE COUNSEL]: Why did you do that?

[MR. STEWART]: I was playing. It was like horseplay.

[DEFENSE COUNSEL]: Was there anything that precipitated that? I mean, like, you're wanting to get in a fight with him?

MR. STEWART: No.

{¶ 21} According to Stewart, he and Scoby wrestled over the gun, and "it went from playing to not playing in less than a minute." Stewart stated that he realized they "weren't playing anymore," and Scoby was holding on to his gun. Stewart hit Scoby in the head, then Scoby let go of the gun. Stewart denied attempting to fire the weapon while it was in his left hand. Stewart acknowledged that the video showed him cocking the weapon, which he described as "a scare tactic, maybe." Stewart stated that he waived the gun in front of himself without placing his finger on the trigger. According to Stewart, the gun

fired when he swung his arm. He denied attempting to pistol whip Scoby. Scoby was within a foot of Stewart's arm's length when he was shot. Stewart testified that his DNA was found on the trigger because he owned the gun, but he maintained that he had not pulled the trigger when the gun fired. After Scoby was shot, Stewart panicked and fled in Jacob W.'s truck.

{¶ 22} On cross-examination, Stewart acknowledged that Scoby had not threatened him or tried to fight with him before Stewart pulled out the gun. He further testified that Scoby had not been facing him and could not have seen what Stewart was doing when Stewart pulled the gun out of the bag; when Stewart made contact with Scoby, Scoby's back was to him. Stewart denied telling Jacob W. that he wanted to fight Scoby right before the shooting. Stewart agreed that, as depicted in the video, he had approached Scoby from behind, at which point Scoby spun around and then moved backward while being shoved by Stewart. Stewart stated that he had been trying to create space between him and Scoby when he hit Scoby on the head, because Scoby was holding onto his gun. He acknowledged that Scoby had been unarmed and that Scoby had had his hands out toward Stewart without showing any aggression. Stewart then cocked the gun and placed a round into the chamber. He stated that the shooting had been accidental and that he had deliberately broken his phone after the shooting "so that nobody would see everything in it that was personal."

Standard of Review

{¶ 23} A court, on motion of a defendant or on its own motion, "shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information,

or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Civ.R. 29(A). "Because a Crim.R. 29 motion tests the sufficiency of the evidence presented at trial, rulings on Crim.R. 29 motions are reviewed under the same standards that apply to a review for sufficiency of the evidence." *State v. Kennard*, 2d Dist. Montgomery No. 29201, 2022-Ohio-2055, ¶ 17, citing *State v. Baker*, 2d Dist. Greene No. 2009-CA-62, 2010-Ohio-2633, ¶ 16; *State v. Crabtree*, 2d Dist. Champaign No. 2019-CA-1, 2019-Ohio-3686, ¶16, citing *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996).

{¶ 24} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *Kennard* at ¶ 18, quoting *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "In a sufficiency of the evidence analysis, 'the persuasiveness of the State's evidence is not at issue.' " *Id.* at ¶ 19, citing *State v. Kuruc,* 9th Dist. Medina No. 15 CA 0088-M, 2017-Ohio-4112, ¶ 35. "[T]he relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *Id.* at ¶ 18, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "An appellate court undertakes de novo review of the trial court's decision on a Crim.R. 29(A) motion and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt." *State v.*

*Sparks*, 2d Dist. Greene No. 2010-CA-55, 2011-Ohio-3868, ¶ 32, citing *State v. Turner*, 2d Dist. Montgomery No. 18866, 2002 WL 10491, *3 (Jan. 4, 2002).

Aggravated Murder

**{¶ 25}** R.C. 2903.01(A) proscribes aggravated murder and states: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

**{¶ 26}** "The phrase 'prior calculation and design' suggests ' "an act of studied care in planning or analyzing the means of the crime, as well as a scheme [en]compassing the death of the victim." ' " *State v. Davison*, 2d Dist. Montgomery No. 28579, 2021-Ohio-728, ¶ 21, quoting State *v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17, quoting Ohio Legislative Service Commission, *Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures,* at 71 (1971). " 'Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of "prior calculation and design." ' " *Id.,* quoting *Walker* at ¶ 17.

**{¶ 27}** *Walker* further discussed the analysis to determine the existence of prior calculation and design as follows:

> The phrase "prior calculation and design" by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act

committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death. The General Assembly has determined that it is a greater offense to premeditate or to plan ahead to purposely kill someone. All prior-calculation-and-design offenses will necessarily include purposeful homicides; not all purposeful homicides have an element of prior calculation and design.

Since the enactment of R.C. 2903.01 in 1974, we have repeatedly emphasized that there is no "bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." [*State v.*] *Taylor*, 78 Ohio St.3d at 20, 676 N.E.2d 82 (1997); *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61; *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 148.

We traditionally consider three factors in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *Taylor* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

*Walker* at ¶18-20.

{¶ 28} *Walker* noted that the Supreme Court previously "upheld aggravated-murder convictions, holding that prior calculation and design existed when a defendant threatened to obtain a weapon and kill his victim and later carried out that plan." *Id.* at ¶ 21, citing *State v. Sowell*, 39 Ohio St.3d 322, 333, 530 N.E.2d 1294 (1988). "Shooting a person execution-style may also establish, at least in part, prior calculation and design." (Citations omitted.) *Id..*

Analysis

{¶ 29} It is undisputed that Stewart and Scoby knew each other. Jacob W. described a Snapchat message from Stewart threatening to find and shoot someone, and Andrea R. described the same message as threatening to find someone and violently hurt the person. Crystal K. described the same message as threatening to "shoot the m**********r in the face." Andrea R. stated that the message was posted three to five days before the shooting. Crystal K. described "a what the hell moment" when she learned of the shooting and remembered seeing the message a few days earlier.

{¶ 30} Stewart went to the Roundtable Bar, a location he undoubtedly knew Scoby patronized. Whether he initially had the weapon or left to retrieve it, he was illegally armed with a gun. Although Stewart denied any strain in his relationship with Scoby, in addition to the testimony about the threatening Snapchat message, Jacob W. testified that, just prior to the shooting, Stewart told him that he intended to fight or injure Scoby. By his own admission, Stewart removed the gun from the bag he carried as he approached Scoby from behind, and no act on Scoby's part seemed to precipitate Stewart's action.

{¶ 31} In the surveillance video of the shooting, which we have reviewed, the atmosphere in the bar initially appeared relaxed, with the patrons interacting in a seemingly friendly way and Scoby playing a few games of pool. The video depicted Stewart leaving the bar, followed by Scoby, who had his shirt in his hand and was wearing shorts. Scoby, who was of slight build, snapped his shirt twice at Stewart. Once outside, Scoby turned his back to Stewart to face the door to the bar, and Stewart put his hands on Scoby from behind. While Stewart pushed Scoby toward the parking lot, Scoby turned around to face Stewart. The men scuffled, and Stewart placed his right hand on Scoby's neck while Scoby struggled to stay on his feet. The gun was visible in Stewart's left hand as he continued to push Scoby. The two circled around and moved into the parking lot, and Stewart then hit Scoby with his right hand, knocking off Scoby's ball cap. Stewart and Scoby then separated, and the gun was visible in Stewart's left hand, pointed at Scoby, while Scoby took a submissive posture toward Stewart, bending over at the waist with arms outstretched. It was at this point that, according to Jacob W., Stewart attempted to fire at Scoby but the gun clicked and did not fire. In the video, Stewart then transferred the gun to his right hand and approached Scoby, who continued to back up. Stewart glanced away at a passing vehicle while continuing to advance on Scoby. Stewart and Scoby both appeared to look at Jacob while moving in his direction and facing each other, while Jacob was leaning against his truck. Stewart then turned back to Scoby and pointed at Scoby's hat on the ground, while Scoby backed up partway onto a walkway outside the bar. Scoby's hands were up in the air while Stewart raised his left hand as if to strike Scoby. Scoby continued to back up, moving out of the view

of the camera, as Stewart racked the gun to chamber a round and advanced. From another camera angle, Scoby could be seen falling onto the pavement, with no further movement.

{¶ 32} The manner in which Scoby was shot supported a finding of prior calculation and design. The video established that Stewart was in control of the encounter and was not defending himself from Scoby, who was unarmed. Scoby was shirtless and was seemingly exhibiting a playful demeanor; there was no suggestion that he posed any threat to Stewart. Only after realizing that Stewart was armed did Scoby scuffle with Stewart in a defensive manner. As noted above, when the gun failed to fire initially while Stewart pointed it directly at Scoby, Stewart remained undeterred. Stewart shot Scoby although Scoby had posed no threat, had tried to evade Stewart, and had no means of escape.

{¶ 33} Based upon the foregoing, we conclude that sufficient evidence supported Stewart's aggravated murder conviction. The degree of care and the length of time Stewart took to consider killing Scoby were sufficient to establish prior calculation and design. Although the video showed that the encounter was of short duration before Scoby was shot, the evidence did not compel the conclusion that the shooting was a spontaneous, spur of the moment decision on Stewart's part, in light of his threatening Snapchat message, his remarks to Jacob W. prior to shooting him, and his persistence in shooting Scoby. Stewart's actions suggested that he purposely shot Scoby. In other words, adequate evidence on each element of aggravated murder existed to allow the matter to go to the jury and sustain the verdict.

{¶ 34} Stewart's assignments of error are overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.