[Cite as *State v. Johnson*, 2026-Ohio-757.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

    Appellee

v.

CHADWICK JOHNSON

    Appellant

:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. 30506

Trial Court Case No. 2025-CRB-536

(Criminal Appeal from Municipal Court)

**FINAL JUDGMENT ENTRY & OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on March 6, 2026, the judgment of the trial court is reversed in part, vacated in part, and remanded for further proceedings consistent with the opinion.

Costs to be paid by the State.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

MARY K. HUFFMAN, JUDGE

LEWIS, P.J., and TUCKER, J., concur.

**OPINION**

AARON M. HERZIG and NATHAN R. COYNE, Attorneys for Appellant
MARC T. ROSS and GREGORY J. PARKER, Attorney for Appellees

HUFFMAN, J.

{¶ 1} Chadwick Johnson appeals from a judgment entry of conviction, following a bench trial in municipal court, of three counts of aggravated menacing and one count of domestic violence (threats). For the following reasons, the judgment of the trial court is reversed in part, vacated in part, and remanded for a new trial on two counts of aggravated menacing and one count of domestic violence (threats).

**Facts and Procedural History**

{¶ 2} On March 3, 2025, Johnson was charged with three counts of domestic violence (threats) and three counts of aggravated menacing, and he pled not guilty the same day. Each of Johnson's ex-wife and the couple's two children—identified here as K.J., Jane Doe, and John Doe, respectively—was the alleged victim of one domestic violence charge and one aggravated menacing charge.

{¶ 3} On April 7, 2025, in accordance with R.C. 2945.481(C)(1)(a), the State filed a motion to allow Jane and John Doe to testify outside of Johnson's presence. The motion stated that Jane Doe was 9 years old and John Doe was 11 years old, and that the offenses with which Johnson was charged were offenses of violence, as defined under R.C. 2901.01(A)(9)(a). Citing R.C. 2945.481(E), the State argued that requiring the children to testify in Johnson's presence would cause extreme fear, rendering them unable to communicate, and that there was a substantial likelihood they would suffer serious emotional

trauma due to their youth, the serious nature of the alleged threats by Johnson, and the fact that John Doe was already in counseling for anxiety.

{¶ 4} On April 11, 2025, Johnson opposed the motion, asserting that R.C. 2945.481(C)(1)(a) requires evidentiary findings before a witness may testify remotely, and that the State set forth no evidence. According to Johnson, a reading of the entirety of R.C. 2945.481 "reveals that R.C. 2945.481(C)(1)(a) is not mandatory." He argued that to the extent that the court were to find the statute to be mandatory, it would violate his rights to confrontation under the Ohio and United States Constitutions. Citing *Maryland v. Craig*, 497 U.S. 836 (1990), and *State v. Carter*, 2024-Ohio-1247, Johnson claimed that "before a witness may testify remotely, the trial court must find remote testimony necessary on a case-by-case basis." Noting that the Twelfth District, in *State v. Wallace*, 2024-Ohio-4955 (12th Dist.), determined R.C. 2945.481(C)(1)(a) to be a mandatory provision, Johnson directed the court's attention to the dissenting opinion therein. ("My colleagues' interpretation [of R.C. 2945.481(C)(1)(a)] suggests that the General Assembly intended to abrogate the United Supreme Court decision in *Craig*, which it had no authority to do."). *Id.* at ¶ 45. He further asserted that the majority in *Wallace* cast doubt on the constitutionality of the statute. ("These important constitutional issues may need to be addressed in a future appeal, but unfortunately there is no such constitutional challenge regarding the defendant's confrontation rights presented in this interlocutory victim's rights appeal.") *Id.* at ¶ 10.

{¶ 5} On April 15, 2025, after determining Jane Doe to be competent to testify, the court considered the State's motion under R.C. 2945.481(C)(1)(a). The State asserted that the statute was mandatory and proffered email correspondence from John Doe's therapist regarding the extreme anxiety testifying in Johnson's presence would cause for the child, as well as the therapist's curriculum vitae. Defense counsel objected to the admission of the

3

documents and the granting of the motion, citing *Craig* and Crim.R. 16(K). Counsel asserted that "before a witness may testify remotely the trial court must find remote testimony necessary on a case by case basis," further arguing that it would be difficult for counsel to communicate with Johnson from another room. The defense finally requested that Johnson's parents be present with the children if the court were to grant the motion.

{¶ 6} The court determined the language of R.C. 2945.481(C)(1)(a) to be "mandatory," and it granted the State's motion. It admitted the proffered exhibits only "for appellate review," noting that its ruling on the testimony of the children outside of the courtroom was "based solely on the language contained in the statute." In addressing logistics, the court set up a separate courtroom for the child victims' testimony, denied defense counsel's request for Johnson's parents to be present with the victims, set up a two-way video connection between the courtrooms by means of a laptop computer, and provided defense counsel a Bluetooth headset to use to communicate with Johnson. After the children indicated that they did not want to view Johnson, the laptop displaying the video was placed 12-14 feet from the witness stand. Johnson remained in the other courtroom while the children testified.

{¶ 7} Johnson moved for acquittal at the conclusion of the State's case and at the end of trial, but his motions were denied. Johnson was convicted of all three counts of aggravated menacing, and one count of domestic violence (threats) as to Jane Doe. He was acquitted of domestic violence (threats) as to John Doe and K.J.

{¶ 8} Disposition occurred on April 14, 2025. The court merged the aggravated menacing offense with the domestic violence (threats) offense as to Jane Doe, and the State

4

elected to proceed to sentencing on the domestic violence offense.[1] Johnson was sentenced to 180 days on one count of aggravated menacing, with credit for 123 days, with 57 days to be served at the jail; 180 days on the second count of aggravated menacing, with credit for 64 days and 116 days suspended; and 30 days for domestic violence threats, with credit for 64 days. He was also sentenced to two years of non-reporting community control, and a post-conviction no contact order was issued, effective until April 15, 2026.

### Assignments of Error and Analysis

{¶ 9} Johnson asserts two assignments of error. In his first assignment of error, he claims that for several reasons, the trial court erred in granting the State's motion for the children to testify outside of Johnson's presence. First, he argues that R.C. 2945.81(C)(1)(a) "is facially unconstitutional" under Article 1, Section 10 of the Ohio Constitution, which guarantees a defendant in a criminal case the right "to meet the witnesses face to face." Johnson asserts that even if we find that the statute *is* facially constitutional, R.C. 2945.481(C)(1)(a) is unconstitutional as applied to him under the Ohio Constitution. According to Johnson, the trial court erred by interpreting R.C. 2945.481(C)(1)(a) to mandate out-of-court testimony at the State's request because the statute explicitly requires "case-specific findings of fact under division (E) in all circumstances." Johnson asserts that the "face to face" language of the Ohio Constitution is "broader" than that of the Sixth Amendment to the U.S. Constitution, which protects a defendant's right to be "confronted with the witnesses against him."

---

[1] Johnson's initial judgment entry of conviction resolved only five of the six charged offenses, and on May 16, 2025, this court issued a show cause order regarding the unresolved count of aggravated menacing. The subsequent nunc pro tunc entry erroneously states that Johnson was convicted of two counts of aggravated menacing, one count of domestic violence (threats), and found not guilty/acquitted of two counts of domestic violence (threats) and one count of aggravated menacing. It further erroneously states that Johnson was convicted of domestic violence in violation of R.C. 2919.25(B) instead of R.C. 2919.25(C).

5

{¶ 10} Johnson further argues that R.C. 2945.481(C)(1)(a) is unconstitutional facially and as applied under the United States Constitution. He claims that the statute "dispenses with a defendant's Sixth Amendment right . . . without requiring case-specific findings of necessity based on admissible evidence," and that the statute cannot survive *Craig* or *Coy v. Iowa,* 487 U.S. 1012 (1988). Johnson asserts that in the absence of any case-specific findings of necessity, the court applied R.C. 2945.481(C)(1)(a) in an unconstitutional manner. Finally, he argues that allowing Jane and John Doe to testify was not harmless error because their testimony was "the keystone to the State's case."

{¶ 11} The State responds that it set forth reasons in its motion to have the children testify outside of Johnson's presence, and for "this reason alone, the statute cannot be facially unconstitutional under either the Ohio or U.S. Constitution in all its applications." Regarding Johnson's "as-applied" challenges, the State directs our attention to *State v. Wallace*. As to whether or not it was harmless error to allow the children to testify, the State asserts that "[e]ven removing the live testimony of the children, there is still overwhelming proof of [Johnson's] guilt for aggravated menacing against, at the very least [Jane Doe and K.J.]." The State asserts that Johnson's aggravated menacing conviction against K.J. "is independent and unaffected [by] the testimony of the child victims."

{¶ 12} In his second assignment of error, Johnson asserts that the trial court erred in overruling his Crim.R. 29 motion for acquittal. The State responds that sufficient evidence supported Johnson's convictions. We first address the confrontation issue.

Standard of Review

{¶ 13} "'Where preserved by objection, review of Confrontation Clause claims is for harmless error.'" *State v. Hartman*, 2016-Ohio-2883, ¶ 83 (2d Dist.), quoting *State v. Habo*, 2013-Ohio 2142, ¶ 35 (11th Dist.). "'A constitutional error can be held harmless if we

6

determine that it was harmless beyond a reasonable doubt.'" *State v. Edwards*, 2013-Ohio-1290, ¶ 27 (11th Dist.), quoting *State v. Conway*, 2006-Ohio-791, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24 (1967). The harmless error inquiry is not merely an examination of the sufficiency of the remaining evidence; rather, "'the question is whether there is a reasonable probability that the evidence complained of might have contributed to the conviction.'" *State v. Miller*, 2020-Ohio-3854, ¶ 42 (11th Dist.), quoting *State v. Conway*, 2006-Ohio-791, ¶ 78. "A lack of prejudice exists where there is 'other evidence of guilt' before the jury that is 'overwhelming.'" *Id.*, quoting *State v. Edwards*, 2013-Ohio-1290, ¶ 40 (11th Dist.). "The remedy for this error is a new trial." *State v. May*, 2011-Ohio-6637, ¶ 53 (7th Dist.).

R.C. 2945.481 and Confrontation Rights

{¶ 14} R.C. 2945.481 is part of Ohio's statutory framework governing when child victims may testify outside the physical presence of a defendant in a criminal proceeding. It requires the State to file a motion at least seven days before trial, except for good cause shown, asking that testimony be taken outside the defendant's physical presence. "The purpose of the rule is to provide sufficient time for defense counsel to prepare for the hearing." *State v. Messenger*, 2022-Ohio-3120, ¶ 45 (7th Dist.).

{¶ 15} R.C. 2945.481 states, in relevant part:

(C)(1)(a) In any proceeding in the prosecution of any charge of a violation listed in division (A)(2)(a) of this section or an offense of violence and in which an alleged victim of the violation or offense was a child who was less than thirteen years of age when the complaint, indictment, or information was filed, whichever occurred earlier, the judge, upon motion of the prosecution, the child victim, or the child victim's attorney, if applicable, shall order the

7

testimony of the child victim to be taken in a room other than the room in which the proceeding is being conducted and be broadcast into the room in which the proceeding is being conducted to be viewed by the jury, if applicable, the defendant, and any other persons who are not permitted in the room in which the testimony is to be taken but who would have been present during the testimony of the child victim had it been given in the room in which the proceeding is being conducted.

(b) In any proceeding that is not otherwise eligible for the protections provided for in division (C)(1)(a) of this section, and in which an alleged victim of the violation was a child who was less than eighteen years of age when the complaint, indictment, or information was filed, whichever occurred earlier, upon motion of the child victim, the child victim's attorney, if applicable, or the prosecution, and upon a showing by a preponderance of the evidence that the child will suffer serious emotional trauma if required to provide live trial testimony, the judge shall order that the testimony of the child victim be taken in a room other than the room in which the proceeding is being conducted and broadcast into the room in which the proceeding is being conducted to be viewed by the defendant who is charged with the violation or act and any other persons who are not permitted in the room in which the testimony is to be taken but who would have been present during the testimony of the child victim had it been given in the room in which the proceeding is being conducted.

(2) Except for good cause shown, the prosecution, child victim, or child victim's attorney, if applicable, shall file a motion under this division at least seven days before the date of the proceeding. The judge may issue the order

8

upon the motion of the prosecution, child victim, or child victim's attorney, if applicable, filed under this section, if the judge determines that the child victim is unavailable to testify in the room in which the proceeding is being conducted in the physical presence of the defendant, for one or more of the reasons set forth in division (E) of this section. If a judge issues an order of that nature, the judge shall exclude from the room in which the testimony is to be taken every person except a person described in division (A)(3) of this section. The judge, at the judge's discretion, may preside during the giving of the testimony by electronic means from outside the room in which it is being given, subject to the limitations set forth in division (A)(3) of this section. To the extent feasible, any person operating the televising equipment shall be hidden from the sight and hearing of the child victim giving the testimony, in a manner similar to that described in division (A)(3) of this section. The defendant shall be permitted to observe and hear the testimony of the child victim giving the testimony on a monitor, shall be provided with an electronic means of immediate communication with the defendant's attorney during the testimony, and shall be restricted to a location from which the defendant cannot be seen or heard by the child victim giving the testimony, except on a monitor provided for that purpose. The child victim giving the testimony shall be provided with a monitor on which the child victim can observe, during the testimony, the defendant.

{¶ 16} R.C. 2945.481(E), in turn, states:

For purposes of divisions (C) and (D) of this section, a judge may order the testimony of a child victim to be taken outside the room in which the proceeding is being conducted if the judge determines that the child victim is

9

unavailable to testify in the room in the physical presence of the defendant due to one or more of the following:

(1) The persistent refusal of the child victim to testify despite judicial requests to do so;

(2) The inability of the child victim to communicate about the alleged violation or offense because of extreme fear, failure of memory, or another similar reason;

(3) The substantial likelihood that the child victim will suffer serious emotional trauma from so testifying.

As noted above, without addressing Johnson's constitutional challenges and without any case-specific findings, the trial court determined that remote testimony was mandatory over objection based on the language of R.C. 2945.481(C)(1)(a).

**{¶ 17}** "There are two primary ways to challenge the constitutionality of a statute: by facial challenge or through an 'as-applied' challenge." *Jones v. MetroHealth Medical Center,* 2017-Ohio-7329, ¶ 60 (8th Dist.), citing *Harrold v. Collier*, 2005-Ohio-5334, ¶ 37. A "facial challenge asserts that the law is unconstitutional as applied to the hypothetical conduct of any person, without reference to the defendant's specific conduct or circumstances." *State v. Naylor*, 2024-Ohio-1648, ¶ 76 (11th Dist.), citing *Kruppa v. Warren*, 2009-Ohio-4927, ¶ 12 (11th Dist.). "Facial challenges are the most difficult to mount successfully since the challenger must establish that 'no set of circumstances exists under which the act would be valid.'" *Id.*, quoting *Wymsylo v. Bartec, Inc.*, 2012-Ohio-2187, ¶ 21. "In an as-applied challenge, on the other hand, the challenger contends that the statute's application violates his or her constitutional rights under the circumstances of a particular case." *State v. Grevious,* 2022-Ohio-4361, ¶ 18, citing *United States v. Christian Echoes Natl. Ministry, Inc.*,

10

404 U.S. 561, 565 (1972). "An as-applied challenge asserts that a statute is unconstitutional as applied to the challenger's particular conduct." *Naylor* at ¶ 76, citing *Kruppa*, ¶ 12.

{¶ 18} "Ordinarily, the Sixth Amendment's Confrontation Clause 'guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact.'" *Pitts v. Mississippi*, 607 U.S. __, 146 S.Ct. 413, 415 (2025), quoting *Coy*, 487 U.S. at 1016. "In child-abuse cases, however, that rule sometimes gives way." *Id.* "Consistent with the Sixth Amendment, a court may screen a child witness from the defendant when 'necessary to protect [the child] from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate.'" *Id.*, quoting *Craig*, 497 U.S. at 857. Before invoking this procedure, however, a court "must 'hear evidence' and make a 'case-specific' finding of '[t]he requisite . . . necessity.'" *Id.,* quoting *Craig* at 855.

{¶ 19} Regarding Johnson's position that the Ohio Constitution confers "broader rights" than the Sixth Amendment, the Ohio Supreme Court has noted that "[o]ne might argue that because of its explicit textual recognition of the right to face-to-face confrontation, the Ohio provision provides rights to the accused greater than those recognized by the United States Supreme Court in *Craig* regarding the federal guarantee." *Carter,* 2024-Ohio-1247, at ¶ 33. In 1980, however, the Ohio Supreme Court "dismissed the proposition that 'the Ohio constitutional provision is more demanding of a face-to-face confrontation that that of the United States Constitution.'" *Id.,* quoting *State v. Madison,* 64 Ohio St.2d 322, 330 (1980). In 1990, the Ohio Supreme Court "held that Article I, Section 10 of the Ohio Constitution 'provides no greater right of confrontation than the Sixth Amendment,' *State v. Self,* 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990), and noted that [the Court's] interpretation of the Ohio Constitution 'paralleled' the United States Supreme Court's interpretation of the

federal guarantee." *Id.*, quoting *Self* at 78. *See also State v. Bansobeza*, 2025-Ohio-2704, ¶ 39 (2d Dist.), quoting *Self* at 79.

{¶ 20} While the trial court failed to conduct any analysis in making its blanket determination that R.C. 2945.481(C)(1)(a) is mandatory, a practice we discourage, case law and the plain language of the statute demand a different result. Although reviewing a prior version of R.C. 2945.481, *State v. Collins*, 2011-Ohio-6365 (7th Dist.), is instructive regarding the applicability of R.C. 2945.481(E) to R.C. 2945.481(C)(1)(a). Therein, the Seventh District considered the distinction between R.C. 2945.481(A)(2) and (C) or (D). *Collins* noted that "[u]nder the plain language of [R.C. 2945.481(A)(2)], the prosecution may move for a deposition, and may request that the deposition be videotaped as described, and the court 'shall' grant those motions . . . ." *Id.* at ¶ 69. Such a motion "does not trigger the requirements of R.C. 2945.481(E)." *Id.* "The requirements of R.C. 2945.481(E) explicitly apply only to sections (C) and (D) which qualify testimony given outside the courtroom." *Id.* at ¶ 70. This conclusion is further supported by the plain language of division (F)(2) of the statute, which states that a "judge who makes any determination regarding . . . the taking of testimony outside of the room in which a proceeding is being conducted under division (C) or (D) of this section, shall enter the determination *and findings* on the record in the proceeding." (Emphasis added.). *See also State v. Knauff*, 2011-Ohio-2725 (4th Dist.) (R.C. 2945.481 requires case-specific findings of necessity before a judge can utilize closed-circuit television procedures.).

{¶ 21} The Third District recently compared the language in R.C. 2945.482, which concerns the testimony of a victim with a developmental disability, with R.C. 2945.481. *State v. Saunders*, 2024-Ohio-2224 (3d Dist.), citing *State v. Pflug*, 2007-Ohio-2037, (6th Dist.) (also considering a prior version of R.C. 2945.481). *Saunders* found that the "language in

12

R.C. 2945.482 is closely aligned to the language in R.C. 2945.481, which is the recodified version of the statute at issue in *Self* regarding child sex offense victims." *Id.* at ¶ 43. *Saunders* compared R.C. 2945.482(D) to R.C. 2945.481(C), and R.C. 2945.482(F) to R.C. 2945.482(E). "In *Pflug*, the Sixth District examined *Craig* and *Self*, then rejected the defendant's argument that R.C. 2945.482 is unconstitutional because it allegedly deprived him of his constitutional right of confrontation." *Saunders* at ¶ 43, citing *Pflug* at ¶ 6, 18-33.

{¶ 22} Finally, as noted above, while *Wallace* found R.C. 2945.481(C)(1)(a) to be mandatory, the case involved an interlocutory victim's rights appeal that did not address the constitutionality of the statute, and we conclude that any reliance on *Wallace* by Johnson is misplaced. Based upon the foregoing, R.C. 2945.481, by its plain language, does not run afoul of the right to confrontation in the Ohio or U.S. Constitution, but the trial court's interpretation of the statute did so in that it failed to comply with the statute's plain language and with *Craig*.

Harmless Error

{¶ 23} We must next determine if the Confrontation Clause violation was harmless beyond a reasonable doubt. *See U.S. v. Moses*, 137 F.3d 894 (6th Cir. 1998) (allowing child witness to testify by closed-circuit television without complying with statutory requirements was not harmless error where the child provided the only eyewitness testimony and remaining evidence was of questionable value); *Lomholt v. Burt*, 219 F.Supp.2d 977 (N.D.Iowa 2002) (finding any Confrontation Clause error from children testifying via closed-circuit television was harmless where defendant's confession and other corroborating evidence was sufficient to sustain conviction). To resolve this issue, we review the evidence adduced at trial.

13

**{¶ 24}** Jane Doe testified that Johnson lived in Michigan, and on the weekend of December 13-15, 2024, she and John Doe had visitation with him. On Sunday, they planned a trip to the Boonshoft Museum, and while stopped at a Walmart on the way, K.J. called her and John Doe, which "set [Johnson] off." According to Jane Doe, K.J. was on speakerphone, and Johnson began loudly yelling at the children to get off the phone, using profanity. John Doe was in the front seat, and Jane Doe, who was "really scared," was in the back seat. The children ended the call, and K.J. then texted them that "everything was going to be all right."

**{¶ 25}** After the call, Jane Doe testified, Johnson was driving "a little bit crazy" and swerving back and forth across the road. Jane Doe was nervous and feared "we were going to crash." Johnson did not try to hurt her or John Doe. Jane Doe testified that she "didn't really think he was going to hurt us in any way," and she stated that he has never spanked her or her brother. She testified that K.J. had advised the children that "if anything felt bad" to make a recording of what was happening so K.J. could "send it to her lawyer because she didn't want us to lie about anything." Jane Doe then recorded Johnson with her Apple watch without his knowledge. She identified two recordings that were played in court, noting that in the first recording, which was made on the way to the Boonshoft, she and Johnson were audible. Jane Doe said that she, Johnson, and John Doe were audible in the second recording, which was made in the Boonshoft parking lot. According to Jane Doe, they did not enter the museum because she "didn't feel safe going in because I was too scared." She testified that she believed Johnson was threatening her, John Doe, and K.J., because he had previously threatened to kill all of them.

**{¶ 26}** Jane Doe testified that K.J. taught her and John Doe to use code words regarding Johnson. The word "pickle," or a pickle emoji in a text message, meant "that you need somebody to come find you or you need help." She testified that "banana," or a banana

14

emoji, signified that the children need the police immediately, and that she texted a banana emoji to K.J. In response, K.J. asked if the police were needed, and Jane Doe replied "maybe" because Johnson had gotten out of the car and was smoking a cigarette. Johnson then "came over to me while I was texting mom because he saw me and I couldn't text yes because he was staring directly at my phone." She identified an exhibit reflecting the text messages.

{¶ 27} Jane Doe stated that Johnson got back in the car, and after initially refusing to take the children home, he drove to the Centerville police station where he and K.J. normally exchange the children. K.J. arrived thereafter, and once in her vehicle, Jane Doe played the recordings from her watch for her. In turn, K.J. played them for a police officer who had responded to the scene.

{¶ 28} Jane Doe testified that she and John Doe hugged Johnson goodbye when they left, and that she "had a really good weekend with him until that day." She stated that she loved Johnson and believed that he loved her, but "when he said he threatened to kill us I thought he was being legit."

{¶ 29} John Doe testified that he had just turned 12. He stated that on the date of the incident, when the phone call with K.J. ended, Johnson "started yelling at us and saying that we don't spend enough time with him and that sort of stuff" in a voice that was "very high and angry." Johnson used profanity and made John Doe feel "scared and threatened a little bit." He did not respond to Johnson because he was too scared "because of the stuff he was saying." John Doe was not aware that Jane Doe was recording Johnson from the backseat. He identified his, Johnson's, and Jane Doe's voices on the recordings, and he stated that he believed Johnson would kill him based upon the "way that he was looking at us and the fact that he's threatened to do that before." John Doe stated Johnson was driving fast and

swerving the car, and it "made me feel scared for my life." He did not use his phone or his watch to call for help because Johnson was watching him, and John Doe worried doing so would further anger his father. He acknowledged that Johnson never made a threatening gesture towards him or tried to hit him. He stated that although Johnson verbally indicated that he would never harm the children, the reassurance "wasn't really working because he was still in an angry threatening mood." When asked if he ever believed Johnson would hurt him, John Doe responded, "I think maybe. I don't know exactly but I feel like if he got mad enough he would hurt us." John Doe believed that Johnson was going to kill him that day "because of all the threats that he made and the reckless driving on his part." He testified specifically that he was worried about the threats potentially occurring in the future "because he was still driving so I didn't think he could do anything but I was worried he would eventually." John Doe acknowledged that Johnson had never spanked or hit him, that he loved his dad, and Johnson loved him.

{¶ 30} After arriving at the police station and hugging Johnson goodbye, John Doe told Centerville Police Officer Eckenrode what happened in the car. He testified consistently with Jane Doe about their use of code words, "since this type of stuff has happened before," further stating that "banana is I need you to call the cops and pick me up dad's doing something scary."

{¶ 31} K.J. testified that Johnson was scheduled to have visitation with the children one weekend a month in Ohio, typically at a hotel in Centerville. On the day of the incident, while her divorce from Johnson was pending, and in the course of her call with the children, K.J. suggested to Jane Doe that Johnson could renew the family's Cincinnati Zoo membership that included the Boonshoft Museum. Although K.J. was on speakerphone, Johnson spoke to her "through the kids," stating, "tell your mom that I don't need to do what

16

she is telling me to do and this is my weekend and she needs to get off the phone." K.J. described Johnson as "angry, elevated, loud, profanity, and yelling at me. Just rageful." After the call ended, K.J. texted the children, telling them to let her know if they were okay. She identified a subsequent "text thread" between her and the children. K.J. stated that "banana" or a banana emoji "was part of a safety system that we had set up the three of us, [Jane Doe, John Doe,] and myself." She testified that there "were two emojis and two code words, pickle and banana." According to K.J., "Pickle meant that they needed to speak with me, that they felt unsafe, or needed to contact me for any reason. That was kind of the safer of the two." In contrast, "Banana was supposed to be used in case of an absolute emergency. If we needed to involve law enforcement." K.J. advised the children "not to ever use" the banana code "unless they really meant it."

{¶ 32} K.J. identified a text message that she sent to Jane Doe's and John Doe's phones at 11:48 a.m. that stated: "Do not hesitate to call me back if you feel unsafe or uncomfortable in any way. You are ALWAYS allowed to reach out to me, will not get in trouble. I love you both so much. I would appreciate knowing you're okay after hearing how Dad is acting right now." She testified that she received a response from Jane Doe stating, "I have [two] recorded," "HE IS CRAZY help," and a banana emoji. K.J. testified that she responded, "Police? Yes or no?" After Jane Doe responded "maybe," K.J. advised her and John Doe to keep their phones on, and Jane Doe responded, "Ok I'm scared." Jane Doe subsequently told K.J., "Meet us at the police station now we are going home."

{¶ 33} K.J. testified that she called 911. She provided the text messages to Officer Eckenrode, and Jane Doe played the recordings for K.J. and the officer in the parking lot. K.J. testified that she believed that when Johnson said, "You have no idea how easy it would

17

be for me to kill all three of you," he was referring to her and the children. She believed the threat to be real based upon prior threats "that were very similar to both me and the kids."

{¶ 34} On cross-examination, K.J. acknowledged that according to an order in place for almost a year in domestic relations court, Johnson is permitted to contact the children only between 8:00 and 9:00 p.m. when they are with her, and she may contact the children only between 8:00 and 9:00 p.m. when they are with him. She acknowledged that she routinely disregarded the order during Johnson's visitations, and based on phone records produced in prior litigation with Johnson, she acknowledged that she called John Doe and Jane Doe each just before 11:30 a.m. on December 15, 2024. She further acknowledged that she called her divorce attorney twice at 11:56 a.m. and at 11:58 a.m. prior to calling 911, and that she called the Centerville Police Department at 12:32 p.m., reporting her suspicion that Johnson was on drugs. K.J. acknowledged that the text messages she provided to law enforcement were screen shots from her phone, and that she specifically "called law enforcement because of the banana issue."

{¶ 35} K.J. stated that when she arrived at the police station, Johnson was there with the children, and an officer was speaking to him. Upon her arrival, the children came to her vehicle, and at no point did Johnson speak to K.J. directly or call her phone. She further acknowledged that at no point in time was Johnson not in the presence of law enforcement while she was at the police station. According to her testimony, she did not feel any threat from Johnson at the station. K.J. reiterated that she "was fearful when he was alone with the kids when I heard how he was speaking to them," but she stated, "I do feel safe with law enforcement." Finally, K.J. acknowledged that she did not hear the recordings that inspired her fear until Jane Doe played them in K.J.'s vehicle at the police station. When asked if she had "any knowledge or information from any source . . . that on December 15, that [Johnson]

18

ever physically touched or physically threatened the kids or you," K.J. responded, "I don't have any, no."

{¶ 36} Officer Chad Eckenrode of the Centerville Police Department testified that on December 15, 2024, he was dispatched for a welfare check on an eleven-year-old and a nine-year-old child in the custody of their father. He proceeded to the Centerville police station to take the call. Eckenrode arrived before Johnson and then immediately contacted him upon his arrival. Eckenrode was aware that K.J. had reported that she suspected Johnson was on drugs. He did not notice any illegal substances or odor of alcohol when speaking to Johnson. Within five minutes, K.J. arrived with another male whom she identified as her boyfriend. Eckenrode spoke to her also, and he used his body-worn camera to record the recordings made by Jane Doe. One recording was made at 11:45, and the other at 11:53 a.m.

{¶ 37} Eckenrode stated that the recordings were "disturbing" because Johnson "made mention that he could have killed all three of them . . . during a heated argument where he's using profanity." Eckenrode said that Johnson was in an agitated state in the recordings. According to Eckenrode, when confronted, Johnson acknowledged making the statements but stated "they were just a poor choice of words." Eckenrode's interaction with Johnson was also recorded on his body camera, which was played for the court. After K.J. took the children home and returned with a protection order, Eckenrode arrested Johnson. Eckenrode stated that K.J. took screenshots of the text messages from her phone to provide to police, and he said that what K.J. sent him were the same texts that she showed him in the parking lot.

{¶ 38} We have viewed Eckenrode's body camera video. When the officer approached Johnson's vehicle, he was outside, on the passenger side, reaching into the

19

backseat and appeared calm. Johnson explained that K.J. had interrupted his limited parenting time. After the children spoke to K.J. for five to seven minutes, he told them to get off the phone. Johnson repeatedly expressed frustration with his situation and stated that he loved his children. Johnson acknowledged that he became upset and raised his voice to his children. According to Johnson's testimony, prior to K.J.'s phone call, he and the children "had a great time," playing laser tag, going out to dinner, and wrestling on the bed in his hotel room.

{¶ 39} Eckenrode asked Johnson to wait in his car while he spoke to K.J. Eckenrode's body camera footage shows K.J. was seated in the backseat of a vehicle with the door open, with Jane Doe in the middle seat beside her and John Doe on the other side. On Eckenrode's approach to K.J.'s vehicle, she immediately said that Johnson had told the children that if he "wanted to kill them he would have already done it," and that she taught them to make recordings "when he acts like that." Jane Doe can be seen retrieving a recording from her watch at K.J.'s instruction, which was played for Eckenrode. Johnson can be heard ranting in an agitated manner at his children using profanity. He can also be heard telling the children that if he intended to kill them, they would already be dead, and saying, "Do you know how easy it would be for me to kill all three of you?" K.J. stated that Johnson had made previous threats and that an existing protection order prohibited harassment and threats, but the kids were not included in the order.

{¶ 40} Another profanity-laced recording was played for Eckenrode at K.J.'s urging. K.J. stated that she did not understand how Johnson's conduct was not "endangerment at this point." Jane Doe can be heard to say that the recordings were made "all in the car just now." Eckenrode advised K.J. to remove the children from the scene and return with her protection order.

{¶ 41} Eckenrode then returned to Johnson's vehicle and removed him. He advised Johnson about the recordings made by Jane Doe that he had just heard. Johnson acknowledged that Jane Doe had told him that she was afraid and that he had told the children that he could harm them "in whichever way I want to whenever I want to" but that he would never do so. When Eckenrode asked Johnson if he had said, "If I wanted to kill you, I could kill all of you, but I'm not," Johnson admitted doing so. After further conversation, Eckenrode patted Johnson down and walked him to his cruiser.

### Jane Doe and John Doe

{¶ 42} The record reflects that Jane and John Doe were critical witnesses in the State's case to establish Johnson's guilt. They testified regarding Johnson's conduct, and they identified Johnson's voice on the recordings Jane Doe made on her watch. We must determine if their testimony was prejudicial. This leads us first to K.J.'s testimony authenticating the text message exchange between her and the children.

{¶ 43} "Authentication is governed by Evid.R. 901." *State v. Goings*, 2025-Ohio-485, ¶ 31 (2d Dist.). "Evid.R. 901(B) provides examples of several ways that the authentication requirement may be satisfied. The most common method is oral testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1)." *Id.* at ¶ 32, citing *State v. Quarles*, 2015-Ohio-3050, ¶ 34 (2d Dist.), and *State v. Renner*, 2013-Ohio-5463, ¶ 30 (2d Dist.). Generally, "'in most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages.'" *Id.*, quoting *State v. Irwin*, 2015-Ohio-195, ¶ 21 (2d Dist.), quoting *State v. Roseberry*, 2011-Ohio-5921, ¶ 75 (8th Dist.)   Here, K.J. authenticated the text messages exchanged between her and Jane Doe.

**{¶ 44}** An authenticated document, however, "may be inadmissible if its contents violate the hearsay rules." *Quarles* at ¶ 36. Hearsay "'is defined as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Id.,* quoting Evid.R. 801(C). "In general, hearsay is not admissible." *Id.,* citing Evid.R. 802. While Ohio does provide exceptions to the hearsay rule through specifically enumerated categories in Evidence Rules 803, 804, 807, and 801(D), those exceptions are not applicable here. Put differently, Jane Doe's statements to K.J. in the text message exchange regarding Johnson's conduct, while authenticated by K.J., were inadmissible hearsay.

**{¶ 45}** We are then left to consider the testimony and body camera video of Officer Eckenrode. As discussed above, Eckenrode testified and the body camera video reflected that Johnson admitted making the threatening statements that served as the basis of his charges. In other words, the only evidence against Johnson consisted of his admissions.

**{¶ 46}** "The 'corpus delicti' of a crime means the body or substance of the crime, and it consists of two elements: (1) the act, and (2) the criminal agency of the act." *State v. Flucas*, 2018-Ohio-3340, ¶ 14 (12th Dist.), citing *State v. Maranda*, 94 Ohio St. 364, paragraph one of the syllabus (1916). "It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the corpus delicti, before such confession is admissible." *Maranda* at paragraph two of the syllabus.

> "'The doctrine * * * was born out of great caution by the courts, in consideration of certain cases of homicide wherein'" a defendant's confession was used to convict him of a crime that never occurred. [*State v. Morgan*, 2014-Ohio-250, ¶ 16 (12th Dist.), quoting *Maranda* at 370]. However, given the procedural safeguards afforded defendants in modern criminal practice, "the practicality

22

of the rule has come into serious question." [*State v. Gray*, 2012-Ohio-4769, ¶ 27 (12th Dist.)]. Consequently, the Ohio Supreme Court has indicated that although the corpus delicti rule remains applicable, it need not be applied with a "dogmatic vengeance." *Morgan* at ¶ 16. The burden on the state to provide some evidence of the corpus delicti is minimal and it is sufficient if there is some evidence outside of the confession that tends to prove some material element of the crime charged. [*State v. Sturgill*, 2004-Ohio-6481, ¶ 9-10 (12th Dist.)].

*Flucas* at ¶ 15.

**{¶ 47}** Given our determination regarding the nature of the remaining evidence against him, Johnson's admissions to threatening his children were the only evidence against him. Put differently, the trial court's error was not harmless as to Johnson's convictions for aggravated menacing as to Jane and John Doe and for domestic violence (threats) as to Jane Doe.

**{¶ 48}** Having so concluded, Johnson's first assignment of error is sustained as to Jane and John Doe, and we accordingly need not address Johnson's second assignment of error as to the children.

K.J.

**{¶ 49}** We must separately address Johnson's second assignment of error with respect to K.J. Johnson argues that the trial court erred in overruling his Crim.R. 29 motion.

**{¶ 50}** Under Crim.R. 29(A), a court, on motion of a defendant or on its own motion, "shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because a Crim.R. 29 motion tests the sufficiency of the

23

evidence presented at trial, rulings on Crim.R. 29 motions are reviewed under the same standards that apply to a review for sufficiency of the evidence." *State v. Kennard*, 2022-Ohio-2055, ¶ 17 (2d Dist.) (citing cases).

{¶ 51} "'A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law.'" *Kennard* at ¶ 18, quoting *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "'When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt.'" (Citations omitted.) *Id.*, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). "'An appellate court undertakes de novo review of the trial court's decision on a Crim.R. 29(A) motion and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt.'" (Citation omitted.) *State v. Sparks*, 2011-Ohio-3868, ¶ 32 (2d Dist.), quoting *State v. Turner*, 2002 WL 10491, *4 (2d Dist. Jan. 4, 2002).

{¶ 52} R.C. 2903.21(A) proscribes aggravated menacing as follows: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . or a member of the other person's immediate family."

> Ohio courts have found that the offense of aggravated menacing does not require the state to demonstrate the "'offender is able to carry out his threat or that he intends to carry it out or believes himself capable of carrying it out,' nor does it 'require proof that the offender threatened imminent serious physical

24

harm.'" (Emphasis sic.) *State v. March-Natali*, [2022-Ohio-4061, ¶ 37 (11th Dist.)], quoting *State v. McDonald*, [2018-Ohio-3845, ¶ 34 (11th Dist.)]. The state is required to demonstrate that the victim's subjective belief is that the defendant will cause serious physical harm. *McDonald* at ¶ 34, citing *State v. Gardner*, [2017-Ohio-7241, ¶ 21 (8th Dist.)]; *State v. Perkins*, [2006-Ohio-3678, ¶ 14 (8th Dist.)]. "[A] person can be convicted of aggravated menacing even though the person has not made any movement toward carrying out the threat." (Further citation omitted.) *March-Natali* at ¶ 37.

*State v. Thomas*, 2024-Ohio-5662, ¶ 20 (10th Dist.)

**{¶ 53}** First, K.J. was not in Johnson's vehicle during the call she placed to the children, which was admittedly in a direct and repeated violation of a domestic relations court order. She characterized Johnson as rageful in that call, but her testimony, which was consistent with her statements in the body camera video, exclusively expressed concern about Johnson's subsequent recorded statements and the "banana issue." Most significantly, K.J. acknowledged that she did not learn of the content of those statements until she was at the police station, and the children were both in her vehicle. At that time, according to her testimony, she felt safe in the presence of law enforcement, and she was permitted to remove the children from the scene. K.J. did not have any interaction with Johnson before he was arrested. Under these circumstances, K.J.'s testimony negates the elements of aggravated menacing. In other words, the State failed to demonstrate K.J.'s subjective belief that Johnson would cause serious physical harm to her or the children, and his conviction for aggravated menacing is not supported by sufficient evidence. The trial court erred in overruling Johnson's Crim.R. 29 motion as to the aggravated menacing charge

25

involving K.J., and his second assignment of error is sustained with respect to that conviction.

## Conclusion

**{¶ 54}** Having sustained Johnson's first assignment of error, his convictions for aggravated menacing and domestic violence (threats) as to Jane Doe and his conviction for aggravated menacing as to John Doe are reversed, and this matter is remanded for a new trial on those charges. Having sustained Johnson's second assignment of error with respect to his conviction for aggravated menacing as to K.J., the conviction is vacated.

. . . . . . . . . . . . .

LEWIS, P.J., and TUCKER, J., concur.